## David P. Reighard, James S. Denlinger and William H. Denlinger, Appellants, *v.* Philip S. Flinn and City of Pittsburg.

*Municipalities—Rivers—Public landing—Act of March 31, 1836.*

Where a structure illegally erected by a private individual on a strip of land along the Allegheny river in the city of Pittsburg, dedicated by the Act of March 31, 1836, P. L. 318, for the purpose of a public landing, has been transferred to the city, and the city has accepted it for use as a public landing or wharf by all persons, subject to certain reasonable rules and regulations, the structure cannot be condemned as a nuisance, inasmuch as it is devoted to a strictly public use, which brings it within the general supervision and control of the municipal authority.

Argued Oct. 30, 1899. Appeal, No. 136, Oct. T., 1899, by plaintiffs, from decree of C. P. No. 1, Allegheny Co., Sept. T., 1897, No. 240, vacating injunction. Before GREEN, McCOLLUM, MITCHELL, FELL and BROWN, JJ. Affirmed.

Petition for attachment.

Petition in the nature of supplemental bill to stay injunction. See 189 Pa. 355.

The facts appear by the opinion of the court below which was as follows:

This case is now presented to us by a petition in the nature of a supplemental bill to the original proceeding, praying the court to stay the injunction granted against the defendant as against the petitioners, who have become possessed of all the right of Philip S. Flinn to the property and improvements erected by him, and which in said proceeding were declared to be a public nuisance and ordered to be removed by him as such. The question raised and decided in the original proceeding was that the structure as built and used by defendant, under a lease from the city of Pittsburg, was in contravention of public right and illegal, and therefore should be removed; the councils having no authority to vest in him the exclusive right to use and occupy the landing for a term of years. The question now is, has the city the right to maintain this same structure, illegally erected by defendant, under and subject to its own authority as

supervisor and controller of the public river landings of the city? It is admitted by plaintiffs' counsel that the case now, so far as the removal of the structure is concerned, is the same as though it had been erected originally by the city, and this is evidently a correct position, for equity will never compel the destruction of property which one owned and had a right to maintain and use in its present condition, simply because some other person who had transferred it to him had been guilty of an unauthorized act in its construction. The question then arises, has the city of Pittsburg authority to erect and maintain such a structure as the one erected by defendant, for the purpose now contemplated by the city? In other words, is the structure and its proposed use by the city such a use of the public landing as is authorized by law?

It is clear that the plaintiffs have no right to interfere with the city's use so long as it keeps within legal bounds, even if it does to a greater or less extent have an injurious effect upon their property. After the Supreme Court affirmed the decree of this court, that the structure erected by the defendant should be destroyed and removed, he has relinquished and transferred all his property, right and interest therein to the city of Pittsburg, and the city, by ordinance approved January 17, 1899, accepted the dock or structure erected by him, for and on behalf of the city, " to be thereafter held and used as and for a public landing or wharf, subject to the provisions of the ordinance by which the same was accepted, and such further regulations as may from time to time be ordained." The 2d section of the ordinance provides that all persons desiring to use the said dock shall have the right to use the same for loading and unloading goods, wares and merchandise, subject to such reasonable rules and regulations as may be prescribed by the dock master, with the approval of the director of public works, and fixes rates of tolls. The 3d section provides for the care and management of the dock by creating the office of dock master, to have charge of the operation of the dock, the collecting of tolls fixed by the 2d section, he being required to furnish at his own cost and expense all labor and machinery necessary or convenient for its operation, and to keep it in repair, etc., as the director of the department of public works shall from time to time direct. And the 4th section provides for the

compensation of the dock master, etc., seventy-five per cent of the gross earnings; twenty-five per cent to be paid to the city monthly.

This dock or wharf consists of a structure about 188 feet long, at or near low water mark on the Allegheny river, and extends back therefrom 120 feet to within a few feet of the northerly line of Duquesne Way, upon which is erected an office building, twelve feet wide and thirty feet long and about fourteen feet high, calculated and intended for the transfer of coal and other merchandise from the river to the dock, and fully described in defendant's answer and plans, made a part thereof, in the original case.

There can be no question as to the right of the city under the act of 1836 to fix and adopt a grade for the space lying northwardly from the line of Duquesne Way (within which this dock is placed) and to occupy, fill up and improve the same according to the grade adopted; the space so graded and lying between said way and low water mark on the Allegheny river forever to be occupied, used and employed as a public landing, the councils having full power to make such rules, regulations and laws regulating the use of said public landing as they may think proper and not inconsistent with the existing laws of the commonwealth; to direct and enforce the collection of such fees, tolls and duties in the nature of wharfage as they may deem best and expedient, and as incident thereto that special portions of the landing may be set aside and used under the authority of the city for the purposes for which it was dedicated to the public, and for any method of use which may be the best for the accomplishment of such purpose. The dedication was manifestly to facilitate commerce and the transfer of goods and merchandise between the river and the shore, and whatever will reasonably conduce to that end would seem to be incident to and inseparable from it. The manner of its use is not to be limited to the methods employed at the time of the dedication. They may and must change with the exigencies of commerce; new methods of transportation render new arrangements necessary to suit them; increased business requires increase of facilities; unpaved and unwharfed landings, which would be sufficient for a small trade, would be entirely unsuitable and insufficient for a large one. "Public landings," say the Su-

preme Court, in Commonwealth v. Alburger, 1 Wharton, 485, " were for a time unwharfed, then wharfed and used for a landing of passengers and of lumber, and now several of the most valuable are let out for steamboat landings and other commercial purposes. This has been the uniform practice and is consistent with the object for which they were bestowed."

This question has been considered and decided by Judge DILLON, sitting in the United States circuit court, by an opinion of great learning and ability, and which seems to cover fully the main question presented in this case : Illinois, etc., Canal Co. v. St. Louis, 2 Dillon, 70. The question involved in that case was the right of the city of St. Louis to authorize the erection of a grain elevator and appurtenance on the Mississippi wharf, upon ground dedicated to public use for a wharf. Among other things he says : " The dedication of the property was perpetual and for the benefit of the public. The extent of the dedication, its scope, remains the same, but the mode of using property dedicated for a wharf may change from time to time as the wants of commerce or the public requires, and this the dedicator is presumed to contemplate when he makes the dedication." And again : " A wharf is intended to afford conveniences for the landing of vessels, the loading and unloading of their cargoes, and to supply a place on which wares discharged from vessels or awaiting shipment may be laid or deposited, and it would seem that structures or appliances of any kind intended to facilitate the handling and preservation of merchandise arriving at the wharf erected under municipal control would be lawful and within the purpose for which wharf property was acquired or dedicated." Proceeding then to consider the power of the city under its charter, " to construct all needful improvements in the harbor, to erect, repair and regulate public docks and wharves, to charge and collect wharfage," etc, which to make the most of it, confers no broader power than the act of 1836, wherein it says : " The said councils shall have full power to make such rules, regulations and laws regulating the use of said public landing as they may think proper and not inconsistent with existing laws," he says : " It will be perceived that there is no express legislative authority to the city to erect buildings, or authorize the erection thereof, upon the property known as the public wharf, and here the complainant takes the position

that, without direct legislative sanction, it is not competent for the municipal authorities themselves, or under an otherwise unobjectionable ordinance, to authorize the erection of an elevator building upon the wharf, to be used for handling grain arriving at or to be shipped from it. . . . The argument is that the occupation of it by a permanent structure of any kind is an unauthorized use of the property; in other words, it is insisted that it is a perversion of the use for which the property was acquired or dedicated, to allow the erection thereon of an elevator to facilitate the receipt and shipment of grain in bulk at the wharf, and consequently such a structure would be a public nuisance. This makes it necessary to consider what are the legitimate uses of property dedicated for a public wharf. Clearly it was to make provision that rafts, boats and vessels of all kinds could effect a landing in front of the city and have a place upon which to discharge or from which to receive wares, merchandise and cargoes of all description. This was to be done upon the bank or margin of the river, which, whether improved or not, was compendiously styled the public wharf. . . . . The city is authorized to regulate the public wharf. Its right to appropriate different parts of the banks, called the wharf, to different uses of a proper character, admits of no doubt." This case so fully covers the case in hand that further excerption therefrom becomes unnecessary and wearisome. The same question is discussed in Barney v. Keokuk, 94 U. S. 324, by the Supreme Court of the United States, and the doctrine expressed by Judge DILLON fully approved. The same conclusion is arrived at in Belcher Sugar Refining Co. v. St. Louis Grain & Elevator Co., 101 Mo. 192, where the opinion of Judge DILLON, in 2 Dillon, 70, is cited and approved.

If these decisions are to be regarded as law, and they not only emanate from the highest judicial authority, but seem to be sustained by the clearest principles of common sense and public necessity, the city of Pittsburg is now owning and maintaining the structure or dock erected by the defendant for the purposes designated in its ordinance and acceptance, is exercising a legal right under the law of the commonwealth, and is not guilty of the maintenance of a nuisance by so doing. It will be observed that in the cases above cited the word " wharf " is used, while in the act of 1836 the dedication is for a "public

landing," and it is urged that the term "landing" does not comprehend a "wharf," and that therefore the cases cited do not properly apply to this case. It is undoubtedly true that a landing does not necessarily include a wharf, but the difference is simply that a wharf is an improved landing, and no less a landing because it is a wharf. Were this not so, the improvement of a mere landing, so as to give it the actual character of a wharf, would be prevented and rendered unfit to meet the emergencies of commerce and destroy the very object of its dedication. We are therefore of opinion that the order that defendant destroy and remove the structure called a dock in his answer, should not be enforced against the city of Pittsburg, but that the defendant should pay all the costs of the original bill and also of this proceeding.

The court subsequently entered the following decree:

And now, to wit: May 20, 1899, this cause came on to be heard on petition of the plaintiffs and motion for attachment against defendant, and also on petition in the nature of a supplemental bill filed by the city of Pittsburg and the answer thereto, and was argued by counsel, and upon consideration thereof it is ordered, adjudged and decreed as follows:

1. It appearing to the court that the lease to Philip S. Flinn, referred to in the bill, has been surrendered and canceled, and that the wharf erected on the premises has been transferred to and accepted by the city of Pittsburg, and is now held and used by the city as a public landing, for public use, the motion for an attachment is dismissed.

2. It is further ordered, adjudged and decreed that the decree heretofore made in this case, in so far as it requires the removal or destruction of the dock or structure described in the supplemental bill, be and the same is hereby vacated and modified so as to permit the city of Pittsburg to maintain the said dock or structure as a public landing.

3. It is further ordered that the defendant, Philip S. Flinn, pay the costs of these proceedings, both upon the original bill and upon this petition.

Plaintiffs appealed.

*Error assigned* was the decree of the court.

*George W. Guthrie*, for appellants.—The business of a public wharfinger is a public business, just as is the operation of a street railway or a natural gas line, but a city cannot undertake one or the other unless expressly authorized by the state.

The "hoist," or "dock," while intended, as the ordinance declares, as a means for "loading and unloading" merchandise and "the speedy handling and delivery" of the same, can only be operated by the machinery and labor to be furnished by the dock master, and can only be used by those who employ and pay him for his services and submit themselves to the rules and regulations prescribed by him and approved by the director of the department of public works. Clearly, therefore, the structure is nothing more nor less than a "hoist" or "dock" at which the city is to carry on the business of a public wharfinger.

But even though the city had the authority to engage in such business, it had no authority to appropriate this space for that purpose.

The case of Illinois, etc., Canal Co. v. St. Louis, 2 Dillon, 70, on which the court below relied, has no application. All the facts in that case are diametrically opposite to those existing in this case. The case of Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co., 101 Mo. 192, also quoted by the court below, related to the power of the city of St. Louis, under the express authority to acquire wharves, and either to pave them or "to set aside or lease portions of the unpaved wharves for special purposes, such as the erection of sheds, elevators and warehouses, for any purpose tending to facilitate the trade of the city."

*Johns McCleave*, with him *Clarence Burleigh, J. H. Beal* and *D. T. Watson*, for appellees.

PER CURIAM, January 2, 1900:

We think the question now presented on this record is materially different from the one which arose when the case was here before. The landing in question is now devoted to a strictly public use which brings it within the general supervision and control of the municipal authority. The views expressed by the learned court below we think are those which now control the

situation, and we therefore affirm the judgment upon the opinion filed.

Judgment affirmed and appeal dismissed at the cost of the appellants.